HAVENOR and another, Appellants, vs. PIPHER and others, Respondents.

*January 14 — February 1, 1901.*

*Equity: Compelling conveyance of land: Resulting trusts: Mortgages: Laches.*

1. In an action by persons claiming to be the equitable owners of land to compel a conveyance thereof to them the evidence is *held* to sustain a finding of the trial court that the entire purchase price had been paid by one of the defendants, in whose name the deed was taken, and that he did not hold the land in trust for the person under whom the plaintiffs claim.

2. In such a case, even if the deed to said defendant was in fact a mortgage to secure advances, a conveyance would not be compelled without repayment of such advances.

3. Sec. 2077, Stats. 1898, would seem to be fatal to any claim that the title was held by said defendant in trust, whatever was the fact as to the payment of the consideration.

Havenor and another vs. Pipher and others.

4. A delay of twenty-three years after the title was vested in said de-
fendant, before the bringing of an action to compel a conveyance,
during all of which time his son (the person alleged to have been
the equitable owner and under whom plaintiffs claimed by de-
scent) was *sui juris* and cognizant of all the facts, and not only
did not question, but by affirmative acts constantly recognized,
his father's ownership, is *held* to bar the action on the ground of
laches.

APPEAL from a judgment of the circuit court for Green
Lake county: GEORGE W. BURNELL, Circuit Judge. *Affirmed.*

This is an action in equity to compel the defendants to
convey to the plaintiff *Havenor* a certain lot and store build-
ing thereon in the city of Berlin, Wisconsin. The plaintiff
claims as the only son and heir at law of one Mary J. Pipher,
deceased. The complaint alleges, in substance, that on the
25th of December, 1870, at Berlin, Mary J. Pipher (then
Mary J. Havenor) was married to one Wilson Pipher, and
remained his wife until December 18, 1897, when he died
intestate; that at the time of his death Wilson Pipher owned
the real estate in suit; that he had no children, and that
Mary J. Pipher was his sole heir at law; that Mary J.
Pipher died March 17, 1898, intestate, and that the plaintiff
*Havenor* is her only son and heir at law, and the plaintiff
*McClelland* the duly appointed and qualified administrator
of her estate; that on the 16th of December, 1870 (nine days
before the marriage), Wilson Pipher negotiated with the
firm of Bellis & Hathaway for the purchase of the real es-
tate in question, which was then owned by them, and that
such negotiations resulted in an agreement dated on such
last named date to buy said real estate for the sum of $5,700,
of which sum $1,000 was to be paid down, and the balance
in semi-annual payments of $500 each, with ten per cent.
interest; that at the same time Wilson Pipher purchased of
Bellis & Hathaway a stock of merchandise and some fixtures
and household goods in the store building for the sum of
$3,050, upon credit, and it was agreed that said Wilson

Pipher should give two notes of the defendant *John Pipher* for said purchase of personal property, each for the sum of $1,500, due respectively one and two years from date; that it was agreed between Wilson and *John Pipher* that, in order to secure *John Pipher* for his liability upon said notes, he should take the contract for the purchase of the real estate in his own name, and that pursuant to such arrangement *John Pipher* gave said notes, and Bellis & Hathaway made said contract for the conveyance of said real estate to said *John Pipher;* that thereupon Wilson Pipher took possession of said real estate and personal property, and continuously occupied said real estate as his homestead up to the time of his death; that he paid said sum of $3,000 with his own funds, and that the first payment of $1,000 on the real estate was made by him with the money of Mary J. Pipher, and that the balance of the purchase money of said real estate was thereafter paid, and that said Mary J. Pipher paid $4,500 thereon, and that it was understood between Wilson Pipher and Mary J. Pipher that the deed to said real estate should be taken in the name of Mary J. Pipher; that upon the payment of all of the purchase money of said real estate said Bellis & Hathaway, on the 16th of December, 1874, executed a warranty deed, running to *John Pipher*, of said real estate, but said deed was never delivered to *John Pipher*, but was delivered to Wilson Pipher, and by him recorded, and never came into the possession of *John Pipher* until after Wilson's death, and that it was in fact executed for the use and benefit of Wilson Pipher; that *John Pipher* held title to said premises during the lifetime of said Wilson Pipher, but had no actual interest therein, and did not claim to be the owner thereof, and that the said Wilson Pipher was at the time of his death the equitable owner of said premises; that *John Pipher* now claims to be the owner of said premises, and denies the right of said Wilson Pipher, and of said Mary J. Pipher as heir at law of

Havenor and another vs. Pipher and others.

Wilson Pipher, therein; that on the 6th of January, 1898, *John Pipher* deeded said premises, without consideration, to the defendants *Winter* and *Johnston*, reserving to himself a life interest therein, and that said defendants now claim to be absolute owners thereof; that the building on said premises consists of a store building and living rooms, and that said defendants, immediately on the death of Wilson Pipher, took possession of the same, and still remain in possession thereof, and that the full rental value of said property is $600 per year, and the value thereof at least $6,000; that the plaintiffs have no adequate remedy at law. Wherefore judgment was prayed that the defendants convey said premises to the plaintiff *Havenor*, and that a receiver be appointed to collect the rents thereof during the pendency of this action, and other equitable relief be given.

The defendants, by their answers, alleged, in substance, that the defendant *John Pipher* purchased said premises and paid for the same with his own moneys, and thus became the absolute owner thereof, and denied all equities either in Wilson Pipher, or Mary Pipher, or the plaintiffs in this action.

The action was tried by the court without a jury, and the testimony was somewhat voluminous. Many facts were undisputed.

The evidence showed that in the fall of 1870 Wilson Pipher, who was then living in the city of Berlin, was out of business, and did not have any property, so far as known. His father, the defendant *John Pipher*, was a farmer of means, living near Horicon. Bellis & Hathaway owned the real estate in question, on which there was a building, and they had therein a stock of goods and fixtures, and operated a saloon and restaurant and sporting goods store. Wilson Pipher negotiated with them to buy the property and business, the result of which negotiation was that *John Pipher*, the father, came to Berlin, and a written contract

was made by Bellis & Hathaway on the 16th of December, 1870, to sell said real estate to *John Pipher* for $5,700 as in the complaint alleged. At the same time the goods and other personal property in the store were sold by Bellis & Hathaway to Wilson Pipher, and *John Pipher's* notes taken in payment, and Wilson Pipher went into possession of the real estate, and began operating the business. At the time of this purchase Mary J. Havenor was also living in the city of Berlin doing a small millinery business, and not possessing any considerable means, so far as known. On the 25th of December, 1870, Mrs. Havenor and Wilson Pipher were married. The evidence does not show the volume of business done by either of them, but Mrs. Pipher continued to transact her millinery business for some years, and the plaintiff transacted the saloon and restaurant business, and they lived over the store upon the premises in question. The notes given on the purchase of the personal property, as well as the deferred payments provided for in the contract for the sale of the real estate, were all paid prior to December, 1874. Owing to a difficulty, which occurred immediately after the sale of the restaurant, between Wilson Pipher and Bellis & Hathaway, none of the payments were made to Bellis & Hathaway personally by the Piphers, but they were all made through Mr. T. C. Ryan, a lawyer of Wausau, then residing at Berlin. The moneys were brought to Mr. Ryan by either Mr. or Mrs. Pipher, and taken by him to Bellis & Hathaway, and indorsed upon the contract. In December, 1874, when all the money had been paid, Wilson Pipher requested Mr. Ryan to obtain from Bellis & Hathaway a deed of the premises in the name of Mary J. Pipher, but Bellis & Hathaway refused to make such a deed, because their contract ran to *John Pipher*, so a deed was made to *John Pipher*, and delivered to Wilson Pipher, who immediately recorded it. Mrs. Pipher was informed that a deed had been made to *John Pipher* within

a week after it had been made.   There is little, if any, evidence to show who furnished the moneys to make the deferred payments, save the fact that the moneys were brought to Mr. Ryan by either Wilson Pipher or Mary Pipher.   The defendant *John Pipher*, an old gentleman now eighty-five years of age and evidently very feeble, testified that he paid the entire purchase price of the land; and there is no direct evidence to the contrary, except that one witness testified that *John Pipher* told him that Mrs. Pipher paid the first $1,000 on the land.   In the year 1883, Wilson Pipher and Mary J. Pipher had difficulties, and separated, but no divorce was obtained.   There is testimony tending to show that Wilson Pipher then paid to Mary J. Pipher $4,500, which was considered to be an equitable division of the property of Wilson.   Wilson Pipher continued to live upon the property and conduct the business until his death.   During all the time, and after the deed of the property was made in 1874, the real estate was kept insured in the name of *John Pipher.* It was also assessed to *John Pipher*, and the tax receipts made out in his name.   No step was, however, taken by Wilson Pipher to obtain the title to the premises during his lifetime, and this suit was commenced after his death. There was considerable evidence on both sides as to admissions made by Wilson Pipher to the effect that his father owned the premises and as to admissions made by *John Pipher* to the effect that the premises belonged to Wilson.

The court found, in effect, that the purchase price of the real estate was all paid by *John Pipher*, that the deed from Bellis & Hathaway to *John Pipher* was executed with the knowledge and consent of Wilson Pipher, and that Mary J. Pipher had full knowledge and information at or about the time of the execution of the deed that the same was executed to *John Pipher*, and had knowledge of all the other facts; that at the time of the separation of Wilson Pipher and Mary Pipher in 1883 they divided the estate, both real

and personal, by mutual agreement and consent, and Wilson Pipher paid to Mary the sum of $4,500.

As conclusions of law the court found that this action was stale, and that the plaintiff, and those through whom he claims, were guilty of laches; that the deed to *John Pipher* was not a mortgage; that on the plaintiff's own showing he is subject to the provisions of sec. 2077, Stats. 1898; that *John Pipher* became the absolute owner of said premises by virtue of his deed; and that at the time of the commencement of this action the defendants *Mrs. Winter* and *Elizabeth Johnston* are such owners, subject to the life estate of *John Pipher.*

Upon these findings the complaint was dismissed, and the plaintiffs appeal.

For the appellants there was a brief signed by *W. J. Turner,* of counsel, and *John J. Wood* and *W. J. & J. H. Turner,* attorneys, and a brief in reply and oral argument by *W. J. Turner.* They contended, *inter alia,* that the deed was never delivered to *John Pipher,* consequently no title passed to him. *Barns v. Hatch,* 3 N. H. 304; *Herbert v. Herbert,* 12 Am. Dec. 192; *Jackson v. Phipps,* 12 Johns. 418; *Maynard v. Maynard,* 10 Mass. 456. The act of recording does not amount to a delivery. *Maynard v. Maynard,* 10 Mass. 456; *Kingsbury v. Burnside,* 58 Ill. 310, 324. A trustee cannot set up laches against his *cestui que trust* until after the trustee has repudiated the trust and assumed possession as an adverse claimant; and the statute of limitations does not run against a party in possession. Perry, Trusts (3d ed.), secs. 863 *et seq.,* 868; *Ruckman v. Cory,* 129 U. S. 387; *Coffee v. Emigh,* 15 Colo. 184; *Bragg v. Olson,* 128 Ill. 540; *Fawcett v. Fawcett,* 85 Wis. 332, 336, 338; *Taylor v. Hill,* 86 Wis. 99.

For the respondents there was a brief by *Perry Niskern,* attorney, and *Thompsons, Hollister & Pinkerton,* of counsel, and oral argument by *A. E. Thompson.*

Winslow, J.   If the fact be, as found by the trial court, that *John Pipher* paid the entire purchase price of the real estate in question himself, it must necessarily follow that the judgment below must be affirmed.   Upon this point the testimony was necessarily quite meager on account of the death of both Wilson Pipher and his wife; but *John Pipher* testified directly that he paid the purchase price of the land, and there was very little, if any, competent testimony to the contrary, except as to one or two vague admissions said to have been made by *John Pipher* in conversations many years since.   When the facts and inherent probabilities are considered, they seem to confirm the conclusion of the court. *John Pipher* was a man of means.   Neither Wilson Pipher nor his wife had any means when the purchase was made. Their only way of procuring money was by the prosecution of a small restaurant and saloon business and a small millinery business.   That they could have made sufficient profit out of these enterprises to pay out $8,750 inside of four years, with ten per cent. interest, is well-nigh incredible; and if they had paid it, or a greater part of it, why did they not at once insist on having the title transferred to them? Certainly we cannot say that the finding of the court on this point is contrary to the clear preponderance of the evidence.

Starting from this fact, the whole case of the plaintiff falls to the ground.   The plaintiff claims under the right, if any, of Wilson Pipher.   If Wilson Pipher had any right in his lifetime to have the title of the land put in his own name on the theory that the deed was in fact a mortgage, he would assuredly have been obliged to pay the advances which *John* had made to purchase the land.   No offer to do that has ever been made, nor is it made in the present case. The fact that *John Pipher* paid the entire purchase price also disposes of any claim that the land was held by *John* for the use of or in trust for Wilson, regardless of the pro-

visions of sec. 2077, Stats. 1898, which section would seem fatal to any claim that the title was held in trust, whatever the fact be as to the payment of the consideration.    No question as to the transfer of a homestead without the signature of the wife is in the case, because no such transfer has been attempted.

Furthermore, the defense of laches in asserting any right is insurmountable.    For twenty-three years Wilson Pipher, under whom plaintiff claims, allowed the title to remain in his father, not only without questioning, but constantly recognizing, his father's ownership by affirmative acts.    The case is rare where, after such a delay, during which witnesses have died and testimony has become effaced from the memory of those remaining, a court of equity will entertain an action to set aside a legal title, when the parties have been at all times *sui juris* and cognizant of all the facts.

*By the Court.*— Judgment affirmed.